UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| ASCENSION DATA & ANALYTICS, LLC, ROCKTOP PARTNERS, LLC, ROCKTOP HOLDINGS II, LLC, AND ROCKTOP TECHNOLOGIES, LLC<br><br>**Petitioners,**<br><br>V.<br><br>**PAIRPREP, INC. D/B/A OPTICSML**<br><br>**Respondent.** | CIVIL ACTION NO. 3:23-cv-00552 |

## PETITION TO VACATE CONTRACTUAL ARBITRATION AWARD

Petitioners Ascension Data & Analytics, LLC, Rocktop Partners, LLC, Rocktop Holdings II, LLC, and Rocktop Technologies, LLC (collectively, "Petitioners") petition and move this Court for an order vacating an arbitration award rendered on February 28, 2023 ("Arbitration Award"), including any modification or amendment thereof as discussed below, and dismissing with prejudice all claims of Respondent Pairprep, Inc. d/b/a OpticsML ("Respondent") against Petitioners asserted in the arbitration *Ascension Data & Analytics, LLC. et al. v. Pairprep, Inc. d/b/a Optics ML,* case no. 01-20-0019-3241 (the Arbitration).

### I. THE PARTIES

1. Petitioner Ascension Data & Analytics, LLC ("Ascension") is a Delaware limited liability company with its principal place of business in Irving, Texas.

2. Petitioner Rocktop Partners, LLC ("Rocktop") is a Texas limited liability company with its principal place of business in Irving, Texas.

3.  Petitioner Rocktop Holdings II, LLC is a Delaware limited liability company with its principal place of business in Irving, Texas.

4.  Petitioner Rocktop Technologies, LLC ("Rocktop Technologies") is a Delaware limited liability company with its principal place of business in Irving, Texas.

5.  Respondent Pairprep, Inc. d/b/a OpticsML ("Pairprep" or "Respondent") is a Delaware limited liability company with its principal place of business at 1 Domidion Court, Middletown, NJ 07748.

## II. JURISDICTION AND VENUE

6.  This Court has subject matter jurisdiction based on a federal question pursuant to 28 U.S.C. § 1331, as Respondent's claims are based in part on the Defend Trade Secrets Act, 18 U.S.C. §1836 *et seq* ("DTSA").

7.  Venue is proper in this Court because the Arbitration was conducted in Dallas, Texas and the award *sub judice* was made therein, as Section 10(a) of the Federal Arbitration Act ("FAA") provides that "the United States Court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration." Moreover, venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Respondent's claims occurred in this District.

8.  This Petition is brought as a predicate for a formal motion to vacate to be heard by the Court pursuant to 9 U.S.C. § 6 ("Any application to the court hereunder shall be made and heard in the manner provided by law for the making and hearing of motions, except as otherwise herein expressly provided."). Petitioners' brief in support of its motion and this Petition to vacate the Arbitration Award shall be filed in a timely fashion after filing this Petition or as otherwise directed by this Court.

9.      Under 9 U.S.C. § 12, this Petition will be served on Respondent within three months after issuance of the Arbitration Award on February 28, 2023, as required by the FAA. Service of this Petition on Respondent will be made in a timely fashion as provided by statute. In addition, Respondent will be electronically served with this Petition through its counsel after the filing thereof.

### III. PROCEDURAL AND FACTUAL BACKGROUND

#### A. Claims Asserted Between the Parties and Against Altada

10.     Ascension and its insurer initiated the Arbitration on December 23, 2020, asserting various claims to recover approximately $2 million in remediation costs from a data breach Respondent Pairprep caused by leaving its servers open to the internet without any security or password protection for over a year, in which thousands of loan documents containing personal data on more than 60,000 consumers stored by Respondent Pairprep in internet repositories were exposed to the public (the "Data Breach"). Pairprep was notified of the Data Breach on January 15, 2019.

11.     On February 22, 2021, over two months after Ascension initiated the Arbitration, Pairprep filed suit in U.S. District Court for the Eastern District of Texas, CA No. 2:21-cv-00057-JRG ("Eastern District Action"), against Ascension, ReidPin LLC, Rocktop Partners LLC, and Ursus Holdings, LLC (a related company), alleging claims for Misappropriation of Trade Secrets under the DTSA, Texas Theft Liability Act, Tex. Civ. Prac. & Rem. Code §§ 134.001-134.005, Tortious Interference with Prospective Business Advantage, Fraud and Misrepresentation, Breach of Contract, and Quantum Meruit. The above claims arose out of business relations between the parties after entering into a Master Services Agreement ("Pairprep MSA") in February 2017 (*See* Stephens Decl., Ex. B, filed contemporaneously herewith), which was terminated by Ascension in

August 2019, in part, due to the Data Breach. Defendants in the Eastern District Action timely moved to dismiss that case and compel arbitration given the pending Arbitration initiated in accordance with the arbitration clause in the Pairprep MSA. In September 2021, that Court compelled arbitration and stayed that case.

12. On March 2, 2022, Pairprep asserted counterclaims in the Arbitration that are essentially the same as the claims asserted in the Eastern District Action. (*See* Stephens Decl., Exs. C and D.) However, in addition to naming Petitioners as Counter-Respondents, Pairprep also named Altada Technology Solutions Ltd., an Irish company, and Altada U.S., Inc., its domestic subsidiary (collectively, "Altada"). (Stephens Decl., Ex. D, ¶¶20-21.) Pairprep's claims were based on the allegation that Petitioners and Altada operated as a joint enterprise, representing to the public that they are one and the same, with each having the ability to direct and control the enterprise. (*Id.* at ¶¶23-25.) As discussed further below, Rocktop entered into a Master Services Agreement with Altada in June 2020 ("Altada MSA"). Pairprep alleged that Rocktop disclosed Pairprep trade secrets to Altada, which the latter allegedly used to develop software. (*Id.* at ¶¶106-109.) Despite naming Altada as a party to the Arbitration, Pairprep never effectuated service on Altada in the Arbitration proceeding.

13. Rather, on July 7, 2022, Pairprep filed suit against Altada in U.S. District Court for the Eastern District of Texas, C.A. No. 2:22-cv-002451-JRG, asserting the same claims based on the same allegations in the Arbitration. (*Compare* Stephens Decl., Exs. D and E.) Altada timely answered denying all allegations. (*See* Stephens Decl., Ex. F.) In November 2022, Pairprep settled all claims asserted against Altada and executed a broad release of all claims and causes of action, known and unknown, from the beginning of time to Altada and its directors, officers, agents, investors, servants, affiliates, predecessors, successors, heirs, and assigns. (Stephens Decl., Ex. G,

¶4.) At that time, Rocktop was one of the largest investors in Altada, it was a customer thereof, and an additional insured on Altada's cyber related insurance policy, which covered claims for breach of contract, disclosure of confidential information, and misappropriation of trade secrets.

14.     On November 9, 2022, Pairprep also dismissed <u>with prejudice</u> all pending claims against Altada in the Eastern District of Texas. (*See* Stephens Decl., Ex. H.) Petitioners discovered that dismissal shortly thereafter, amended their answer in the Arbitration to include *res judicata,* issue preclusion, and release as defenses, and sent a letter to the Arbitration Panel urging dismissal of all Pairprep counterclaims in the arbitration, as they are barred, at minimum, by *res judicata* and release. (*See* Stephens Decl., Ex. I, ¶¶ 22-23.)  Despite Petitioners' request for dismissal, the Arbitration Panel did not address those defenses, other than a general statement in the Arbitration Award that all defenses of the parties are denied. (*See* Stephens Decl., Ex. A, p. 13.)

    **B.  Business Relations Between the Parties**

15.     Pairprep has been a defunct company since the above-referenced Data Breach in January 2019, with its only remaining activity being the current litigation and arbitration proceedings.  Ascension is the only company that ever-paid Pairprep for software related services, notwithstanding Pairprep's numerous software demonstrations and other sales efforts. The Pairprep software at issue here has been dormant with no further development or revenue since early 2019.  Moreover, as discussed below, both principals of Pairprep were employed elsewhere not long after the Data Breach.

16.      Pairprep was started by Sean Lanning and John Brozena in mid-2015, shortly after graduating from Columbia University's business school, where they met.  They wanted to develop test-preparation software, hence the name Pairprep. They initially developed a mobile application

that could be downloaded and used for free; however, Pairprep was never able to generate revenue on any variation of that product.

17. In mid-December 2016, after over a year of unsuccessfully seeking to develop business for Pairprep, Mr. Brozena emailed Mike Hartman, a person he met in a start-up accelerator program, about the prospect of providing data extraction services to hedge funds. Mr. Hartman had a pre-existing relationship with Ascension and knew that it was interviewing vendors to extract data from mortgage loan documents. Before introducing Pairprep to Ascension, Mr. Hartman negotiated a finder's fee of five percent (5%) of any revenue that Pairprep may later receive from Ascension.

18. Ascension and the other Petitioners provide services related to the acquisition and management of mortgage loans, typically bought or sold as packages through a bid process, commonly called "bids" or "bid packages." Before meeting Pairprep, Petitioners used software, including artificial intelligence applications, to provide advice and other services to third parties in connection with bid packages for the acquisition or sale of mortgage loans. A single bid package may include hundreds or thousands of loans. The bid packages would often be Early Buy Out ("EBO") loans, where sufficient loan data was digitally available and could be automatically ingested into Petitioners' software to perform desired analyses without the need for data processing or extraction. Other bid packages included "scratch-and-dent" loans, for which Ascension employed data-entry personnel to manually extract certain data.

19. In late 2016, Ascension was interviewing document processing vendors to automate the task of extracting certain data from mortgage documents, when Mr. Hartman urged them to consider Pairprep for that service. In late December 2016, Pairprep demonstrated software that it would "build-out" to extract data from mortgage loans for Ascension and falsified the output

and results of its software to Ascension. Shortly thereafter, the parties entered into the Pairprep MSA effective February 6, 2017. (*See* Stephens Decl., Ex. B.)

20. Section 1(b) of the Pairprep MSA describes the Build-Out of Pairprep's software, during which Pairprep committed to develop, test, and refine its software into a completed product, including training its software models on loan documents supplied by Ascension in order to identify and correct any errors. (*See* Stephens Decl., Ex. B, p. 1.) Section 2 provides that Ascension would pay Pairprep $20,000 per month continuing until the earlier of the completion of Build-Out or four months. (*Id.* at p. 2.) The parties agreed that Build-Out should only take three (3) months and that Pairprep "shall make all reasonable efforts to complete the Build-Out within this time frame." (*Id.*) Section 2(c) provides that Pairprep would be paid the greater of $2,500 per month or total "Click Fees" of $5 per loan, where Pairprep successfully extracted the desired data after the Build-Out phase. (*Id.*)

21. Pairprep and Ascension operated under the Pairprep MSA from February 2017 to January 2019, when the above discussed Data Breach occurred. During those two years, Pairprep was unsuccessful in completing the Build-Out of the software that Pairprep originally agreed to complete in four months. At that time, the project was put on hold, while Rocktop remediated the substantial harm caused by the Data Breach. From March to July 2019, the parties discussed options for completing the software development on Rocktop's systems and under its supervision. ██████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████

22. At all relevant times, Lanning and Brozena developed the software in Pairprep's offices on its servers. Petitioners had access to a user interface to correct errors ("proofing UI") in the data that Pairprep extracted from mortgage loan documents, which corrections were supposed to be used by Pairprep to improve the accuracy of its data extraction service. After the Data Breach in January 2019, Petitioners no longer had access to that user interface or any other aspect of Pairprep's software, and the work on the project was halted as mentioned above.

23. Notwithstanding that Pairprep agreed to build out its software in three-to-four months starting in February 2017, Pairprep did not demonstrate its data extraction service to Petitioners until late July 2017, and that demonstration was so fraught with errors that the parties agreed that a proofing UI was necessary to improve Pairprep's machine learning models. In the last quarter of 2017, Petitioners began using the proofing UI to correct errors in Pairprep's extracted data, but the accuracy of the data extraction process never improved to the point that Petitioners could use it, in lieu of manually extracting data from "scratch-and-dent" loan documents. Even in early 2019 when the Data Breach was discovered, Pairprep had yet to deliver a service that could be used in Petitioners' operations. Notwithstanding Pairprep's agreement to complete the Build-Out as promised, Ascension continued to pay Pairprep $20,000 per month throughout that period, with the payments exceeding $460,000 in total by the time the Pairprep MSA was terminated after the Data Breach. During that period, Ascension paid in full every Pairprep invoice.

**C. Rocktop's Business Relations with Altada**

24. In late 2019, nearly a year after the Data Breach, Rocktop renewed its search for a document processing vendor to extract data from mortgage loan documents. It subsequently entered into an MSA with Altada for that purpose in June 2020. (*See* Stephens Decl., Ex. K.) At

that time, Altada, a company located in Ireland, had a document processing platform that was used in various applications, including data extraction. Rocktop made significant investments in Altada during the term of that agreement and was eventually its largest outside shareholder with Rocktop's interest totaling 31%. Unfortunately, Altada suffered financial difficulties that resulted in the furlough of the software personnel working on Rocktop's project, which ultimately lead to the termination of the Altada MSA in May 2022, prior to the completion of Rocktop's project. Rocktop then purchased a copy of the source code developed by Altada for Rocktop's project. Rocktop archived that code and has not decided whether it will attempt to complete its development. In mid-2022, Altada was placed in receivership and its assets have since been sold to a third party. Hence, at all relevant times before Rocktop and Altada entered into an MSA, during the course of that project, and since then, Petitioners continued to manually extract data from "scratch-and-dent" loans through the use of contract workers paid $18-20 per hour, as both attempts to automate the manual data extraction process through vendors failed.

25. The Altada MSA at Section 7.3(d) required it to maintain insurance coverage for claims arising out of the Altada MSA. (*See* Stephens Decl., Ex. K, p. 5.) Proof of insurance is attached to that agreement, naming Rocktop as an additional insured. (*See id.*, Ex. D thereto.) That policy includes coverage for claims arising out of breach of contract, disclosure of confidential information, and misappropriation of trade secrets. (*Id.* at pp. 1-2.)

D. **The Arbitration Award**

26. ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████ Pairprep requested that the Panel correct that error. Even if the Panel corrects that error, it will not redress the misconduct in the Arbitration proceedings, as discussed herein. Moreover, Petitioners did not agree to any extension of the deadline for the Panel to issue a final award in the Arbitration. Consequently, Petitioners urge this Court to vacate any amendment or modification of the Arbitration Award to address those errors, and others.

### E. Misconduct During the Arbitration Proceeding

27. The Panel caused substantial prejudice and effectively precluded Petitioners from presenting evidence in response to Pairprep's counterclaims by failing to enforce Panel Orders agreed to by the Parties and failing to continue the hearing when Petitioners demonstrated good cause for doing so. Pairprep's counterclaims are based on the assertion that it developed software that included trade secrets. Pairprep developed and stored that software on its servers, to which Petitioners had no access. Pairprep alleges that it orally disclosed trade secrets to Petitioners and that Petitioners later disclosed them to Altada. There is no writing evincing Pairprep's self-serving testimony. Pairprep's counterclaims make general allegations that the trade secrets at issue are

source code, algorithms, and other nondescript things. In response to Petitioners' discovery requests regarding the alleged trade secrets at issue, Pairprep merely parroted the same general categories. On July 20, 2022, Petitioners timely moved to compel Pairprep to supplement its discovery responses to include a legally sufficient description of the alleged trade secrets at issue, but the Panel denied that request. (*See* Stephens Decl., Exs. L and M.)

28. Pairprep likewise failed to comply with, and the Panel refused to enforce, the Stipulated Order re: Discovery of Electronically Stored Information ("ESI Order") entered in this matter, as it related to Pairprep's source code. (*See* Stephens Decl., Ex. P.) During the proceedings, Pairprep refused to produce its source code allegedly at issue in this case in the manner provided in the ESI Order, insisting that it would only be made available via remote access to a computer maintained by Pairprep or its counsel. Petitioners presented this issue to the Panel, and it ordered Pairprep to produce on an encrypted hard drive a copy of its source code that "contain trade secrets misappropriated by Claimants." (*See* Stephens Decl., Ex. M.) Pairprep made a partial production but did not produce the vast majority of its source code maintained on seven servers under its control. On August 29, 2022, Petitioners timely requested that the Panel enforce its Orders and compel Pairprep to produce its source code maintained on the seven servers; however, the Panel rejected that request. (*See* Stephens Decl., Exs. Q and O, respectively.)

29. Petitioners thereafter deposed Mr. Lanning seeking discovery on the alleged trade secrets at issue; however, he was instructed and refused to answer any questions regarding the trade secrets alleged in Pairprep's pleadings and discovery responses. On September 19, 2022, Petitioners timely requested that the Panel compel Mr. Lanning to respond to those deposition questions, and the Panel denied that request. (*See* Stephens Decl., Exs. N and O.)

30.     Pairprep's concealment of the alleged trade secrets at issue and the source code that embodied them continued through expert discovery.  In advance of the deposition of its technical expert, Sam Malek, Ph.D., Pairprep produced a list of materials considered by Dr. Malek, which included a general reference to the source code on Pairprep's seven servers.  In advance of his deposition, Pairprep ignored Petitioners' request to identify the portions of its source code considered by Dr. Malek, as it included millions of lines of code and thousands of files.

31.     Pairprep continued to conceal the alleged trade secrets at issue, and the Panel failed to address the matter, leading up to and included the Final Hearing. The Scheduling Order issued by the Panel required the parties to identify and exchange any exhibits to be offered at the Final Hearing by November 11, 2022.  (*See* Stephens Decl., Ex. R, ¶14.) Pairprep's exhibit list for the Final Hearing failed to identify the source code that would be relied upon at the hearing, but rather, included general references thereto.  By way of example, Pairprep's Exhibit R-243 referred to over 200 folders and more than 1000 files of Altada source code, and its Exhibit R-282 referred to over 1000 folders and more than 3300 files of Pairprep source code – <u>none of which were exchanged by Pairprep with its other exhibits</u>. When Petitioners objected to Pairprep's use of the undisclosed source code at the hearing, Pairprep refused to further identify what source code would likely be used at the hearing and refused to exchange it as an exhibit, as required in the Scheduling Order. (*See* Stephens Decl., Ex. S.)  Petitioners raised this issue with the Panel in advance of the Final Hearing and forewarned that Petitioners may seek a continuance of the Final Hearing if Pairprep offered testimony based on source code that was not previously identified and exchanged as an exhibit to provide Petitioners a fair and reasonable opportunity to prepare for the hearing and present evidence in response thereto. (*See* Stephens Decl., Ex. T.)

32. At the Final Hearing, Pairprep presented evidence from Dr. Malek that Petitioners allegedly misappropriated trade secrets embedded in Pairprep's code, including for the first time, testimony regarding specific portions of Pairprep's source code. Petitioners objected during the hearing given the prejudice caused thereby and requested that the Panel continue the hearing so that Petitioners could take discovery on the source code relied upon by Dr. Malek that allegedly includes Pairprep trade secrets. (*See* Stephens Decl., Ex. U.) The Panel did not consider this request, as one of the Panel members remarked at the close of the hearing that Petitioners did not request any relief, when in fact they had. (*See* Stephens Decl., Ex. V.)

33. During the hearing, as indicated in the Arbitration Award fn. 2, the Panel asked Pairprep to present Dr. Malek's testimony a day earlier and allowed a few additional hours before redirect of Petitioners' technical expert, ostensibly to address the prejudice caused by Pairprep's persistent refusal, with the Panel's acquiescence, to identify the source code that embodied the alleged trade secrets, <u>at any time during the proceedings, including the Final Hearing</u>. Such belated, tepid measures did nothing to address the harm and prejudice caused to Petitioners. One of the defenses to trade secret misappropriation is that an alleged trade secret is a matter of public knowledge. That defense is particularly pertinent in this case involving pre-existing technology, where Pairprep's software employed third-party applications to perform their intended purpose. Developing such evidence requires time and effort <u>after obtaining discovery of the alleged trade secret</u>, which is one of the reasons why Petitioners requested a continuance. The Panel's picayune measures did not provide Petitioners a fair opportunity to present evidence on their defenses to Pairprep's trade secret and other counterclaims. Pairprep's misconduct and the Panel's mishandling of the proceedings support vacating the arbitration award, as they violate at least the Federal Arbitration Act, §§10(a)(3) and 10(a)(4), *et seq*.

34. Further, in this instance, the Panel exceeded its power, without limitation, by wielding its own brand of justice, which was not drawn from the essence of the agreement between the parties or their business relations. Ascension was a customer of Pairprep's that agreed to pay up to $80,000 over three-to-four months for Pairprep to build out software to extract data from loan documents supplied by Petitioners. Over two years, Ascension paid Pairprep over $460,000 and never received a data extraction service that could replace its manual data extraction process, as Pairprep's extracted data was fraught with errors rendering it valueless. By August 2019, when Ascension terminated the Pairprep MSA, that project was five times over budget, years behind schedule, and Ascension suffered substantial losses due to the Data Breach <u>on Pairprep's servers</u>. Ascension was the only company to ever pay Pairprep to develop software or for related services. Its business relations with Pairprep were a total loss, both in the payments made to Pairprep and the addition $2 million expended to remediate the Data Breach on Pairprep's servers.

35. Rocktop did nothing wrong when it later contracted with a different vendor (Altada) that also failed to provide a data extraction service. It did no more than explain the functional requirements of the desired service, in the same manner as it did for Pairprep. While Pairprep alleged in its pleadings that Altada copied its source code, it admitted that was not true at the Final Hearing. Rather, Pairprep made general trade secret misappropriation allegations, then retained Dr. Malek who opined that Pairprep's and Altada's software perform similar functions. While such similarity is not surprising as they both extract data from mortgage loan documents, the similarities do not rise to a level of protectible trade secrets misappropriated by Petitioners or Altada.

## IV. MOTION TO VACATE THE ARBITRATION AWARD

36. Petitioners move to vacate the Arbitration Award, as Pairprep's claims are barred by *res judicata* arising from its dismissal <u>with prejudice</u> of identical claims brought against Altada

in federal court based on the same transaction. *Res judicata* based on a federal judgment should be decided by the district court, as opposed to an arbitration panel. *John Hancock Mut. Life Ins. Co. v. Olick,* 151 F.3d 132, 137-38 (3rd Cir. 1998); *In re Y & A Group Sec. Litig.*, 38 F.3d 380, 382 (8th Cir. 1994); *Kelly v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 985 F.2d 1067, 1069 (11th Cir. 1993); *Miller Brewing Co. v. Forth Worth Distrib. Co.,* 781 F.2d 494, 499 (5th Cir. 1986); *see also Miller v. Runyon, 77 F.3d 189, 194* (7th Cir. 1996). The Panel's failure to dismiss Pairprep's claims on that basis should be given no deference, or alternatively, the Panel exceeded its powers in failing to do so in violation of 9 U.S.C. §10(a)(4).

37. In addition, the Arbitration Award should be vacated because:

a. the Panel engaged in misconduct by failing to continue the hearing when requested by Petitioners, upon sufficient cause shown, in violation of 9 U.S.C. §10(a)(3);

b. the Panel engaged in misbehavior in violation of 9 U.S.C. §10(a)(3), by failing to enforce its Orders, which required Pairprep to produce its source code that included the alleged trade secrets and required Pairprep to identify and exchange its exhibits well in advance of the Final Hearing, including the portions of its source code that it intended to rely upon at the Final Hearing;

c. the Panel so imperfectly executed its powers that a mutual, final, and definite award upon the subject matter submitted was not made in violation of 9 U.S.C. §10(a)(4);

d. the Panel exceeded its power, imperfectly exercised them, and misbehaved by brandishing its own brand of justice in violation of 9 U.S.C. §10(a)(3) or §10(a)(4), which was not drawn from the essence of the agreement between the parties or their business relations; and

  e. the Panel exceeded its power by awarding prejudgment and post-judgment interest and otherwise ignoring or misapplying well established law in violation of 9 U.S.C. §10(a)(4).

## V. ORAL ARGUMENT REQUESTED

38. Petitioners respectfully request that the Court permit oral argument on this Petition and Motion.

## VI. PRAYER FOR RELIEF

39. Petitioners respectfully request that the Court enter an Order:

  a. Vacating the Arbitration Award;

  b. Awarding Petitioners their attorneys' fees and costs for this proceeding and the arbitration;

  c. Dismissing Pairprep's counterclaims with prejudice;

  d. Finding that Pairprep shall take nothing from these proceedings;

  e. Denying Pairprep any equitable remedies, including without limitation injunctive relief; and

  f. Granting such other and further relief as the Court deems proper.

Dated: March 13, 2023

        Respectfully Submitted,

        **FISHERBROYLES, LLP**

By: */s/ Trent D. Stephens*
    **TRENT D. STEPHENS**
    Texas Bar No. 24008081
    trent.stephens@fisherbroyles.com
    2925 Richmond Ave., Ste. 1200
    Houston, Texas 77098
    (713) 425-3730

    **KATIE M. ACKELS**
    State Bar No. 24078948
    katie.ackels@fisherbroyles.com
    Highland Park Place
    4514 Cole Avenue, Suite 600
    Dallas, Texas 75205
    (469) 372-6484

    **CHRIS P. PERQUE**
    State Bar No. 24005828
    chris.perque@fisherbroyles.com
    2925 Richmond Ave., Ste. 1200
    Houston, Texas 77098
    (713) 425-3730

    **ATTORNEYS FOR PETITIONERS**
    **ASCENSION DATA & ANALYTICS, LLC,**
    **ROCKTOP TECHNOLOGIES, LLC, ROCKTOP**
    **PARTNERS, LLC, AND ROCKTOP HOLDINGS II,**
    **LLC**